UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARK M. BENSON,

       Petitioner,

v.                                                                                     Case No. 14-CV-249

TIMOTHY DOUMA, Warden,
New Lisbon Correctional Institution,

       Respondent.

**DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Mark M. Benson was sentenced in state court to thirty years confinement followed by thirty-five years extended supervision after pleading no contest to three counts of homicide, including one count relating to an unborn child, and other related crimes arising out of a deadly motor-vehicle collision he caused by driving while impaired by prescription drugs. He filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254, claiming he is entitled to be re-sentenced because his sentence was based on inaccurate information and because he received ineffective assistance of counsel. For the reasons below, his petition will be denied.

## I. BACKGROUND

At approximately 3:30 p.m. on April 25, 2008, Mark Benson's Cadillac Escalade crashed into the rear of Jennifer Bukosky's Honda Accord while the Accord was stopped at a traffic signal in Oconomowoc, Wisconsin. Bukosky, her unborn child and her ten-year-old daughter were killed. Bukosky's twelve-year old son was also injured in the crash and her daughter's friend suffered great

bodily harm. Benson, an orthopedic surgeon, was driving on a revoked driver's license. He had three prior convictions for obtaining prescription drugs by fraud and three convictions for operating while intoxicated at the time of the collision. In fact, only two days before the collision Benson had been sentenced for his third conviction for operating under the influence. He was ordered to serve a 75-day sentence in the county jail and his driver's license was revoked for 30 months. The sentence was stayed to allow Benson to arrange his affairs before reporting to jail, but Benson was expressly told by the sentencing court that he could not drive.

Although Benson's blood did not contain alcohol or illegal drugs at the time of the crash, it contained several prescription medications. Benson had prescriptions filled for Xanax, an anxiety medication, and Ambien, a sleep-aid, on the morning of the crash. The label on the Xanax bottle warned that the drug may cause drowsiness and that the user should use care when operating a car. The instructions stated to take up to three tablets per day. (ECF No. 9-9 at 14.) The label on the Ambien warned that it may cause drowsiness or dizziness and impair the ability to drive. The instructions stated to take one tablet by mouth at bedtime as needed for sleep. (*Id.*)

Benson admitted taking Xanax, Ambien and the pain medication Percocet prior to the crash. His statements to police as to how much of these drugs he had consumed were inconsistent, but according to one account, he took one Percocet and four or five each of Xanax and Ambien before 10:00 a.m. that day. (*Id.* at 13.) In a letter to the court Benson wrote that he had taken the Percocet as prescribed on the evening of April 24 and early morning hours of April 25. He wrote that he took the Ambien and Xanax on the morning of April 25, but admitted he was not taking them as prescribed. (ECF No. 11-5 at 10.) Apparently, Benson underwent an MRI at 10:00 a.m. on April 25 and was taking the Xanax and Ambien to ease anxiety about the procedure. Benson also stated

2

in his letter to the court that he took an unspecified amount of Ambien and Xanax shortly after the collision to fight off a panic attack. (*Id.* at 11.) Analysis of a blood sample drawn from Benson at 4:30 p.m. on April 25, 2008, approximately one hour after the crash, showed Benson's blood contained 22.1 micrograms per liter (mcg/L) of oxycodone (the generic name for Percocet), 16 mcg/L of alprazolam (Xanax) and 253.9 mcg/L of zolpidem (Ambien).

Benson ultimately entered a plea of no contest to five crimes, including three counts of homicide, one count of causing great bodily harm, and one count of causing injury, all by intoxicated use of a motor vehicle. Benson did not dispute that he was impaired to some degree at the time of the collision, but he stated in his sentencing memorandum that it was difficult to determine the degree of impairment. Benson noted the police officers who interacted with him after the collision had different assessments of his level of impairment. The officer that administered field tests at about 6:30 p.m. concluded Benson was under the influence of one or more central nervous system depressants. Several other officers who had contact with Benson, however, described him as shaken-up by the incident, but alert and very direct. In support of Benson's sentencing argument that the degree of impairment at the time of the collision was low, Benson noted that some of the Ambien and Xanax found in his system was consumed after the collision.

Among the many materials presented to the sentencing court was a report of defense expert Francis Gengo, a doctor of pharmacology. Dr. Gengo noted that Benson had "a history of alcohol abuse, a sleep disorder and has required significant amounts of narcotic analgesics and sedative hypnotics for years." (ECF No. 11-5 at 22.) Based on the analysis of the blood sample taken after the crash and standard clinical pharmacology pharmacokinetic texts, Dr. Gengo concluded that the concentrations of oxycodone and Xanax in Benson's blood indicated "therapeutic concentrations for

3

a patient with substantial chronic pain rather than recreational concentrations." (*Id.* at 24.) Dr. Gengo also noted that the literature demonstrates that chronic use of these drugs at therapeutic concentrations "produces little or no impairment because of the acquisition of metabolic and behavioral tolerance." (*Id.*) Given Benson's history, the report suggested that his use of oxycodone and Xanax on the day of the crash did not cause significant impairment. The same was not true, however, with respect to Ambien.

Ambien is a brand name for zolpidem. Dr. Gengo's stated in his report that the therapeutic concentration of zolpidem was between 3 and 18 mcg/L. He noted that the level of zolpidem found in Benson's blood after the crash significantly exceeded this level:

> The concentrations of zolpidem measured in Dr. Benson's blood shortly after the crash are much higher than those that would be expected if he had taken therapeutic doses of zolpidem at bedtime the night before. These concentrations of 253 ng/ml are much higher than therapeutic and zolpidem has a very short half life. This indicates that Dr. Benson consumed a daytime dose of zolpidem both before and possibly after the crash. I am not able to rule out that zolpidem could have produced significant cognitive impairment in Dr. Benson at the time of the crash.

(*Id.*)[1]

The circuit court explicitly referenced Dr. Gengo's report in his sentencing comments about the level of Benson's impairment. The court first noted that it appeared from Dr. Gengo's report that neither the oxycodone nor Xanax were major factors in causing Benson's impairment, though they both could have contributed. (ECF No. 9-9 at 112.) Instead, the court noted that it appeared from the report that Ambien was "the culprit" since the blood test showed it was present at "much higher than therapeutic levels." (*Id.* at 112-13.) The court also noted that Dr. Gengo stated in his report that at this level Ambien could produce "significant cognitive impairment." (*Id.* at 113.) At

---

[1] Dr. Gengo uses the chemical measurements of ng/ml and mcg/L interchangeably; the parties apparently agree the terms are equivalent.

4

the same time, the court acknowledged the fact that it was not clear what the level of zolpidem in Benson's blood was at the time of the crash: "Now there is some lack of perfect clarity as to when that therapeutic level was reached or the above therapeutic level, because it is reported that Mr. Benson took Ambien both before and after the time of the crash that killed people." (*Id.* at 113.) Ultimately, the court concluded that there was no way "to quantify the degree of Mr. Benson's impairment at the time of the collision. (*Id.*) Although the court concluded that Benson was at "a serious level of being under the influence, of being incapacitated," it did not have information from which to conclude that it was "highly aggravated." (*Id.* at 114.) At the end of a long sentencing hearing at which he heard from thirteen members of the victims' families, the court imposed consecutive bifurcated sentences that amounted to an aggregate sentence of thirty years initial confinement followed by thirty-five years extended supervision.

Benson moved for post-conviction relief on several grounds, including ineffective assistance of counsel and that his sentence was based on inaccurate information in violation of his right to due process of law. In support of his due process claim, Benson submitted an affidavit in which Dr. Gengo averred that after sentencing he had reviewed his report and "discovered a lack of clarity" on the issue of the amount of Ambien in Benson's system. (ECF No. 11-1 at 33.) Gengo averred that the statement in his report "could be misinterpreted." (*Id.*) More specifically, Dr. Gengo explained that the statement in his report that the therapeutic concentration of zolpidem was between 3 and 18 mcg/ml was based on the assumption that Dr. Benson had taken a therapeutic dose of 10 mg of Ambien at bedtime the night before. By contrast, the therapeutic level for 10 mg of Ambien taken 1.6 hours earlier, Dr. Gengo stated, was between 3 and 272 ng/ml. Thus, the level of zolpidem found in Benson's blood (253 ng/ml) was well within the therapeutic level, assuming Benson had

5

taken 10 mg of Ambien within one and a half hours of the blood sample being drawn. In other words, the level of zolpidem in Dr. Benson's blood was consistent with his having taken 10 mg of Ambien after the crash. Under these circumstances, Dr. Gengo stated he could not say whether zolpidem caused Dr. Benson significant cognitive impairment at the time of the crash. (*Id.*) In support of his ineffective assistance of counsel claim, Benson submitted an affidavit in which his former attorney averred that upon reviewing Dr. Gengo's report he had made a mental note that the therapeutic level for zolpidem looked wrong, but forgot to ask for clarification or correction of the range from Dr. Gengo before he submitted the report to the sentencing court. (ECF No. 11-1 at 30.)

The same judge that had sentenced Benson denied his motion for post-conviction relief. The court rejected the due process claim on the grounds that the information in Dr. Gengo's report was not inaccurate and that the sentencing court did not rely on the information in any event. It rejected Benson's ineffective assistance of counsel claim on the grounds that Benson's counsel's performance was not deficient and that Benson was not prejudiced by the alleged deficient performance in any event.

Benson appealed and the Wisconsin Court of Appeals affirmed. *State v. Benson*, 2012 WI App 101, ¶ 17, 344 Wis. 2d 126, 822 N.W.2d 484. The court of appeals concluded that Benson forfeited his due process claim based on inaccurate sentencing information and that Benson's ineffective assistance claim failed because Benson could not show prejudice. The Wisconsin Supreme Court denied review on December 10, 2012, and Benson timely filed an application for a writ of habeas corpus in this court under 28 U.S.C. § 2254 on March 6, 2014.

## II. ANALYSIS

Federal law provides that a district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(a). Under AEDPA, when a state court decides a case on the merits, a federal court can grant a writ of habeas corpus only if the state court's decision was contrary to clearly established Supreme Court precedent, involved an unreasonable application of such precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in state court. *Promoter v. Pollard*, 628 F.3d 878, 888 (7th Cir. 2010); 28 U.S.C. § 2254(d). In this case, Benson raises two grounds for habeas relief: (1) his sentence violates due process because it was based on inaccurate information; and (2) his sentence violates the Sixth Amendment because he received ineffective assistance of counsel.

**A. Due Process**

A defendant in a criminal case has a due process right to be sentenced based on accurate information. *Ben–Yisrayl v. Buss*, 540 F.3d 542, 554 (7th Cir. 2008) (citing *Townsend v. Burke*, 334 U.S. 736 (1948) and *United States v. Tucker*, 404 U.S. 443 (1972)). Not all inaccuracies deprive a defendant of due process, however; the incorrect information must be "materially untrue." *Townsend*, 334 U.S. at 741. Moreover, a defendant who requests resentencing must establish that the sentencing court also relied on the critical inaccurate information when announcing its sentence. *Simonson v. Hepp*, 549 F.3d 1101, 1107 (7th Cir. 2008). A sentencing court demonstrates actual reliance on misinformation when "the court gives explicit attention to it, founds its sentence at least

in part on it, or gives specific consideration to the misinformation before imposing sentence." *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003) (quotations omitted). Thus, to establish a due process violation based on inaccurate information provided to the sentencing court, a defendant must prove two elements: (1) that information before the sentencing court was inaccurate; and (2) that the sentencing court relied on the misinformation in passing sentence. *U.S. ex rel. Welch v. Lane*, 738 F.2d 863, 865 (7th Cir. 1984).

Benson argues that both elements are clearly established in this case. He notes that the prosecutor conceded that Dr. Gengo's report was "just outright incorrect, or at the very least misleading ...." (ECF No. 9-10 at 3.) Benson further argues that the sentencing court clearly relied upon the inaccurate information, concluding that Ambien was apparently "the culprit" in his comment concerning Benson's level of impairment. Before addressing the merits of Benson's due process claim, however, it is first necessary to decide whether it is properly before me.

**1. Procedural Default**

As noted above, the Wisconsin Court of Appeals held that Benson forfeited his due process claim that the sentencing court relied on inaccurate information by failing to object to the allegedly inaccurate information at sentencing. Indeed, not only did Benson not object to the information, he is the one who provided it to the court. Respondent argues that Benson therefore procedurally defaulted his due process claim and the state court's finding of forfeiture constitutes an adequate and independent state law ground for its decision.

"Generally, a federal court may not grant habeas relief if the state court's decision was based on an adequate and independent state law ground." *Promotor v. Pollard*, 628 F.3d 878, 885 (7th Cir. 2010) (citing *Ward v. Jenkins*, 613 F.3d 692, 696 (7th Cir. 2010)). "The adequacy of the state

8

ground decision is a question of federal law, and the ground is considered adequate only if the state court applies the rule in a consistent and principled way." *Id.* (*citing Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005)). Benson argues that the forfeiture rule is not followed consistently by Wisconsin courts and it thus does not constitute an adequate and independent state law ground for rejecting his due process claim.

In support of his argument that the Court of Appeals' forfeiture finding does not constitute an adequate and independent state law ground for its decision, Benson relies on *State v. Thompson*, 2012 WI 90, 342 Wis. 2d 674, 818 N.W.2d 904. In *Thompson*, the defendant went to trial on a charge of first degree sexual assault of a child and did not learn until sentencing that he was facing a mandatory minimum sentence of 25 years. In fact, not only was the defendant unaware of the mandatory minimum sentence, but so were his attorney, the prosecutor and the judge. The trial court found that the failure of the state to inform the defendant of the mandatory minimum sentence in the charging documents violated his right to due process and granted this motion for a new trial, but the court of appeals reversed. On review before the Wisconsin Supreme Court, the state argued that the defendant had waived any defects in the charging documents by failing to object. The Supreme Court analyzed the issue as really one of forfeiture rather than waiver, since there was no question of the defendant's having intentionally relinquished a known right. *Id.* at ¶ 73. Viewing the issue from this perspective, the Supreme Court rejected the state's argument, noting that "[t]here are a few occasions in which the forfeiture rule does not apply because the defendant is not in a position to make a timely objection." *Id.* ¶ 76. The court concluded "it would be unreasonable to strictly apply § 971.31 [providing for waiver] to a situation in which the entire courtroom was operating under a mistaken understanding of the law." *Id.* at ¶ 78. Benson argues that the same

reasoning applies here and that the court of appeals erred in finding that he had forfeited his right to be sentenced on accurate information.

In response to Benson's argument, the Respondent relies on *Promotor* in which the Seventh Circuit rejected essentially the same argument on a similar claim. In *Promotor*, as in this case, the defendant was convicted of multiple counts of homicide by intoxicated use of a motor vehicle. The defense pre-sentence report stated that he had consumed 23 beers in the hours preceding the crash, a number which the sentencing court mentioned twice enroute to imposing a sentence of 66 years imprisonment. 628 F.3d at 881. The defendant later filed a motion for post-conviction relief claiming that the 23 beer figure was incorrect and that in fact he had consumed between 13 and 15 beers. The circuit court denied the motion on the ground that the defendant had waived the objection by not disputing the number at the time of sentencing and the court of appeal affirmed. The defendant then turned to federal court and filed a petition for a writ of habeas corpus, alleging that the Wisconsin courts violated his right to due process and that he received ineffective assistance of counsel. The district court ruled that the due process claim was procedurally defaulted, and the Seventh Circuit affirmed.

In so ruling, the Seventh Circuit explicitly rejected the defendant's argument that the law of waiver and forfeiture was not firmly established and consistently applied by Wisconsin courts. In support of his argument, the defendant in *Promotor* had cited *State v. Groth*, in which the Wisconsin Court of Appeals had stated: "Whether, given the paramount importance of the integrity of the sentencing process, waiver may be invoked to preclude a defendant's challenge to a sentencing based on inaccurate information remains unclear; the cases the parties cite simply do not say." 258 Wis. 2d 889, 655 N.W.2d 163, 172 (Wis. Ct. App. 2002) (internal citations and quotations omitted),

abrogated on other grounds by *State v. Tiepelman*, 291 Wis. 2d 179, 717 N.W.2d 1 (2006). In *Groth* the prosecutor had repeatedly asserted without any factual support that the defendant had beat his pregnant girlfriend. Because there was no support in the record for the inflammatory statements and the court apparently relied on them, the Wisconsin Court of Appeals in *Groth* found that the integrity of the sentencing process required resentencing. *Groth*, 655 N.W.2d at 173. *Promotor* distinguished *Groth* on several bases. The *Promotor* court first noted that the inaccurate information in *Groth* came from the prosecutor, not the defense. 628 F.3d at 886. Moreover, there was no factual basis for the information in *Groth*, whereas in *Promotor* the information was submitted in a pre-sentence report and reviewed before filing. *Id.* The most important fact distinguishing *Groth*, however, was the fact that "the court decided that the interests of justice required excusing the waiver." *Id.* The *Promotor* court concluded:

> Wisconsin courts have regularly followed the rule that information that is not contested at trial cannot be objected to later. The exceptions do not disprove the rule. We find that Wisconsin waiver law was applied in a consistent and principled way, and therefore constitutes an adequate and independent state law ground that cannot be reviewed absent cause and prejudice.

*Id.* at 886-87.

Based on *Promotor*, I conclude that the Wisconsin Court of Appeals' finding that Benson forfeited his due process claim constitutes an adequate and independent state law ground and that any review by this court is dependent on Benson showing cause and prejudice under *Coleman v. Thompson*. As in *Promotor*, the allegedly inaccurate information in this case came from the defense, not the prosecution, and it was contained in a pre-sentence report reviewed by the defense before filing. Also like *Promotor*, the state court did not decide that the interests of justice required excusing the waiver or forfeiture. Benson suggests that the Wisconsin Court of Appeals misapplied

11

Wisconsin precedent and that it should have ignored the forfeiture in this case and addressed the merits in the interest of justice. But federal court's generally do not review state courts' application of state law. "[Federal] review of the adequacy of a state ground is limited to whether it is a firmly established and regularly followed state practice at the time it is applied, not whether the review by the state court was proper on the merits." *Lee v. Foster*, 750 F.3d 687, 694 (7th Cir. 2014).

### 2. Cause and Prejudice

That Benson procedurally defaulted his claim does not end the inquiry. "An adequate and independent state law ground does not . . . absolutely preclude review of a procedurally defaulted claim during federal habeas review." *Promoter*, 628 F.3d at 885. A federal court can review a claim that was procedurally defaulted "if the petitioner can establish cause and prejudice for the default, or establish that the failure to consider the defaulted claim will result in a fundamental miscarriage of justice." *Id.* These are equitable exceptions to the doctrine of adequate and independent state law grounds. *See Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991). Benson does not argue the failure to consider his due process claim will result in a fundamental miscarriage of justice. He does argue he can show cause and prejudice.

Benson correctly notes that a meritorious claim of ineffective assistance of counsel can constitute cause to excuse a procedural defect. *Richardson v. Lemke*, 745 F.3d 258, 272 (7th Cir. 2014). But in order to establish ineffective assistance sufficient to excuse a procedural default, a petitioner must satisfy the familiar two-part test from *Strickland v. Washington*, 466 U.S. 668 (1984). *Richardson*, 745 F.3d at 272. As explained below, Benson's ineffective assistance claim is not meritorious and thus does not constitute cause and prejudice for his procedural default. Benson also argues, however, that justice requires he not be faulted for forfeiting an objection to

12

information he did not know at the time was objectionable. As explained above, this court will not overturn Wisconsin courts' application of Wisconsin rules. But neither does a Wisconsin court's ruling control on a question of federal law. The question presented is whether, under federal procedural default law and in accordance with principles of equity, cause exists in this case to overcome the procedural bar created by state law. I conclude that such cause exists. After all, if, as Respondent argues and the circuit court found, a reasonably competent defense attorney could not be faulted for failing to catch the allegedly latent mistakes in the expert report, it seems harsh to fault Benson for the same failure.

Nonetheless, Benson cannot make the required showing of prejudice in this case because, for the reasons explained in the next section, his due process claim would fail on its merits. The applicable standard Benson must meet was stated by the Seventh Circuit in *Promoter*: "Prejudice is established by showing that the violation of the petitioner's federal rights 'worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" 628 F.3d at 887 (emphasis in original) (quoting *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004)). There is some uncertainty about the precise showing needed to meet this standard, *see Tyler v. McCaughtry*, 293 F. Supp. 2d 920, 925–29 (E.D. Wis. 2003), but it would appear that to show prejudice the petitioner must show both a violation (or in other words, that he defaulted a meritorious claim) and that the violation worked to his actual and substantial disadvantage (i.e., that the violation was not harmless). *Id.* at 929. In the context of the due process claim at issue here, however, to establish the violation necessarily entails establishing that the violation was not harmless. Due process is only violated when materially inaccurate information was actually relied upon in imposing a sentence, and if it was, the error is not harmless and due process requires re-sentencing.

13

It is to these questions that I now turn.

### 3. Merits

Even if Benson had not procedurally defaulted his due process claim, the claim would nevertheless fail. As an initial matter, Benson argues that the deferential standards under AEDPA do not apply to his due process claim because the Wisconsin Court of Appeals did not address this claim on the merits. But this is not correct. The circuit court did address the due process claim on the merits, so AEDPA applies. *See Atkins v. Zenk*, 667 F.3d 939, 943–44 (7th Cir. 2012) (applying AEDPA deference to both prongs of ineffective assistance of counsel claim when state trial court ruled on each prong and state appellate court limited its analysis to deficient performance). Benson also argues Respondent "forfeited" the position that AEDPA deference applies by failing to argue that it does. However, AEDPA limits a federal court's statutory authority to issue habeas relief when a state court has decided a claim on the merits. *Id.*; *see also Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 783 (2011). The fact that Respondent opposed Benson's due process claim on procedural default grounds alone and did not respond to Benson's argument regarding AEDPA deference does not somehow operate to expand this court's statutory authority to review this case. Accordingly, Benson's reliance on *United States v. Giavanette*, 919 F.2d 1223 (7th Cir. 1990), which recognized that a litigant that fails to press a point in the face of contrary authority forfeits the point, is misplaced, and AEDPA deference applies. Under AEDPA's deferential standard of review, I conclude that Benson's due process claim fails.

The inaccurate-information element is concerned with the accuracy of the facts as the sentencing court understood them. For example, the Supreme Court held a sentence violated due process when the prisoner "was sentenced on the basis of assumptions concerning his criminal record

which were materially untrue." *Townsend v. Burke*, 334 U.S. 736, 741 (1948). In this case, Benson's argument is that Dr. Gengo's report "stated an incorrect normal blood level range for therapeutic concentrations of Ambien, which gave the court the false impression that Benson's much higher level showed that he had consumed an excessive dose." (Am. Mem. in Supp. of Pet. at 10, ECF No. 10 at 11.) The circuit court rejected Benson's claim finding both that Dr. Gengo's report was not inaccurate and that the court did not rely on the alleged inaccuracies in any event. The state court's findings are not unreasonable in light of the evidence in the record.

Turning first to the issue of reliance, the post-conviction court noted that it had expressly concluded at the sentencing hearing that it was unclear what Benson's level of Ambien was at the time of the crash since he reportedly took the drug both before and after the crash. (ECF No. 9-10 at 9.) Quoting its sentencing comments further, the court stated: "All in all, no one can, I can't, no expert has told me, any way to quantify the degree of Mr. Benson's impairment at the time of the collision. (*Id.*) These comments, the court noted, amounted to an "express statement that the Court is not relying upon quantification, it's impossible." (*Id.*) Indeed, to further emphasize the point that it was not relying on the amount of Ambien Benson had consumed for its sentence, the court at sentencing had contrasted Benson's case with those in which the record shows the defendant consumed a large quantity of alcohol or drugs just before driving: "I have seen cases where people chug a couple of doubles and then hit the road after they have already been drinking . . . . I don't see that kind of information before me." (ECF No. 9-9 at 114.) The post-conviction court went on to note other factors discussed at sentencing that could have contributed to Benson's failure to control his vehicle, including his use of a hands-free car phone and the back pain and other health problems he was experiencing. But none of these took away from the fact that by his own

admission, Benson was driving under the influence of an intoxicant:

> [T]he defendant was found guilty of multiple offenses of homicide by intoxicated use of a motor vehicle. It was the law of the case at the time of the sentencing that he was intoxicated as the law sets that forth. So, regardless of any discussion about the quantifying effects of any intoxicant, it's already been determined that he had sufficient substances in his system to cause him to be intoxicated."

(ECF No. 9-10 at 10–11.)

The court then turned to its comments about what it considered the true aggravating factor in the case: the fact that Benson had driven into the rear of a car waiting at a stop light directly in front of him in broad daylight without even breaking. Regardless of which drug or combination of drugs caused his impairment, the court stated that "the facts and circumstances of rear ending somebody without hitting the breaks when they're right in front of you in clear view shows a high level of impairment, or lack of proper driving." (*Id.* at 13.)

As to the issue of whether the information in Dr. Gengo's report was false or inaccurate, the court expressly found that it was not. The court noted that Dr. Gengo did not say that the information in his report was false, but only that it could be misunderstood or leave a false impression. In fact, it appears that the primary concern with Dr. Gengo's report was over what he meant by the term "therapeutic level," especially as applied to the Ambien. The therapeutic level he gave for Ambien was based on the assumption that Benson was taking the drug as prescribed, i.e. one 10 mg tablet at bedtime at night. Assuming Benson had taken one tablet at bedtime the night before the accident, Dr. Gengo stated in his report that the concentration of zolpidem in his blood would have been between 3 and 18 mcg/ml, instead of the 253 mcg/ml that was found. This is precisely what Dr. Gengo stated in his original report: "The concentrations of zolpidem measured in Dr. Benson's blood shortly after the crash are much higher than those that would be expected than

16

those that would be expected if he had taken therapeutic doses of zolpidem *at bedtime the night before*." (ECF No. 11-5 at 24.) (italics added). Since Benson admitted he had taken Ambien both before and after the crash, it was not surprising that the concentration of zolpidem in his blood was significantly higher.

Importantly, Dr. Gengo denied providing inaccurate information concerning the level of Ambien that he would expect to find in Benson's blood if he had taken the drug as prescribed:

> I stand by my statement in my previous report, in ¶ 28, that the blood level concentration of zolpidem found in Dr. Benson's blood is 'much higher than those that would be expected if he had taken therapeutic doses of zolpidem at bedtime the night before.' This is because zolpidem has a short half life and much would have been metabolized by mid-afternoon on the day of the crash. However, the level of zolpidem found in Dr. Benson's blood could have been consistent with his consumption of a 10 mg dose within one and a half hours of the sample extraction. Since the blood sample was obtained from Dr. Benson at 4:30 p.m., which was approximately one hour after the crash, I cannot rule out the possibility that the blood level readings could be consistent with his consumption of a dose of zolpidem *after* the crash occurred. Thus, on this record, I cannot say whether zolpidem may have caused him significant cognitive impairment at the time of the crash.

(*Id.* ¶ 7.)

Benson also argues the sentencing court wrongly assumed (based on Dr. Gengo's report) that the body does not acquire a behavioral tolerance to Ambien, when Dr. Gengo's affidavit, relying on manufacturer's data, shows a single dose of Ambien would have no more than a placebo effect on a former drug user like Benson. (Pet.'s Am. Mem. at 12, ECF No. 30 at 13; Gengo Aff. ¶ 8, ECF No. 11-1 at 33.) By Benson's own account, though, he took more than one Ambien before driving on April 25, 2008. Thus, even if Dr. Gengo's affidavit shows the information regarding tolerance to a single dose of Ambien was wrong, that information was not material in this case and cannot be the basis for his due process claim. Moreover, since the sentencing court did not rely on the level of Ambien found in Benson's blood in arriving at the sentence imposed, Benson would not

17

be entitled to relief on this basis in any event.

In sum, even on the merits, Benson's due process claim fails. The post-conviction court's decision denying his claim is not contrary to, nor does it constitute an unreasonable application of clearly established federal law. Further, this court is unable to conclude that the post-conviction court's decision is based on an unreasonable determination of the facts in light of the evidence presented. The court therefore turns to Benson's claim of ineffective assistance of counsel.

**B. Ineffective Assistance of Counsel**

Benson's second ground for habeas corpus relief is that he was deprived of his Sixth Amendment right to effective assistance of counsel. To sustain such a claim, Benson must show his counsel was deficient in his performance and that the deficiency prejudiced Benson. *See Strickland v. Washington*, 466 U.S. 668 (1984). As the Wisconsin Court of Appeals noted, "To prove prejudice, Benson must show that but for counsel's alleged error in submitting Gengo's report to the court and not correcting or objecting to the alleged inaccuracies prior to sentencing, there is a reasonable probability the result of the proceeding would have been different." *Benson*, 2012 WI App 101, ¶ 19 (citing *Strickland*, 466 U.S. at 694). The Wisconsin appellate court concluded that Benson failed to make that showing. 2012 WI App 101, ¶¶ 24–26. Because this constitutes a ruling on the merits, the deferential standard of review under § 2254(d) applies.

The conclusion that there is no prejudice under *Strickland* follows logically from the conclusion that the information at issue was not actually relied upon in imposing the sentence. Benson attempts to avoid this logical result by arguing that the Wisconsin Court of Appeals erroneously applied a subjective test, rather than an objective one as required. According to Benson:

> The court of appeals applied the wrong test when it focused only on whether Judge Davis was affected by the erroneous information, not whether there was a reasonable

> likelihood that a reasonable sentencing judge may have imposed a less severe sentence. The Supreme Court has explained that prejudice does not depend on whether the particular fact-finder would have decided the matter differently but for counsel's errors, but whether the errors could have affected the decision of a reasonable trier of fact. *Hill v. Lockhart*, 474 U.S. 52, 59–60 (1985) ("predications of the outcome at a possible trial, where necessary, should be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker,' quoting *Strickland*, 466 U.S. at 695).

(ECF No. 20 at 14.)

But Benson cites no authority holding that a reviewing court considering whether a defendant is entitled to re-sentencing because of ineffective assistance is prohibited from looking at the actual transcript of the sentencing. Such a rule would appear to run contrary to *Strickland* itself, where the Supreme Court expressly stated that "the defendant must show that [particular errors] *actually had an adverse effect on the defense*." 466 U.S. at 693 (emphasis added). The test is not whether the alleged error is capable of influencing a reasonable judge. *See id.* ("[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."). Additionally, that the idiosyncrasies of a particular judge or jury should not come into play is true enough, but there is no indication whatsoever that the sentencing judge's idiosyncracies were a factor here. Rather, the state appellate court simply concluded that, even assuming the lawyer's performance was deficient, Benson failed to show that any incorrect impression the sentencing court had because of the deficiency actually impacted the sentence. 2012 WI App 101, ¶ 22. Because this is not contrary to *Strickland*, but rather is a reasonable application of it, Benson is not entitled to relief on this ground either.

19

### III.  CONCLUSION

For all of these reasons, Benson's petition is hereby denied and the Clerk is directed to enter judgment dismissing this action.  Because reasonable jurists could conclude otherwise, a certificate of appealability will issue as to each claim.

Dated this 17th day of December, 2014.

s/ William C. Griesbach<br>
William C. Griesbach, Chief Judge<br>
United States District Court